

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Amakua Development LLC, )
a Nevada Limited Liability Company, )
)
            Plaintiff, )    No. 05 C 3082
)
         v. )
)    Hon. Mark Filip
H. Ty Warner, an individual; Ty Inc., )
a Delaware Corporation; Ty Warner Hotels )
& Resorts LLC, a Delaware Limited )
Liability Company; and JTL Capital LLC, )
a Texas Limited Liability Company, )
)
           Defendants. )

## MEMORANDUM OPINION AND ORDER
### DENYING SUMMARY JUDGMENT

Plaintiff, Amakua Development LLC (also "Amakua" or "Plaintiff"), filed this diversity

suit against Defendants, H. Ty Warner (also "Mr. Warner"), Ty Inc. ("Ty Inc."), Ty Warner

Hotels & Resorts LLC (also "Warner Hotels," and together with Mr. Warner and Ty Inc., the

"Warner Defendants"), and JTL Capital LLC ("JTL") in the District Court for the Central

District of California (the "California Court"). (D.E. 1.) On May 11, 2005, the California Court

transferred the suit to this Court on the grounds that it lacked personal jurisdiction over Mr.

Warner and that venue was improper. (D.E. 38 (attached as Exhibit A to D.E. 53).) This Court

subsequently ruled that the suit was properly brought under the district court's diversity

jurisdiction and that California law controlled Counts II (which the Court then dismissed) and III

(for common law fraud). (*See* D.E. 69 at 7, 16–18, 24.)

The suit involves the sale of a resort hotel and surrounding property located in Los Cabos,

Mexico. Plaintiff alleges that, after bringing the Defendants together so that Warner Hotels could purchase the hotel portion of the property from JTL, the Defendants cut Plaintiff out of the deal, in breach of a Confidentiality and Non-Circumvention Agreement (the "Noncircumvention Agreement") Plaintiff had executed with the Warner Defendants. Plaintiff's operative complaint (D.E. 64) alleges state law claims against the Warner Defendants for breach of the Noncircumvention Agreement (Count I), fraud (Count III), quantum meruit (Count IV), and intentional interference with contract against JTL (Count V). (*See* D.E. 64.) Plaintiff claims some $30 million in alleged damages.

This Court previously dismissed Count II, for breach of the implied covenant of good faith and fair dealing. (*See* D.E. 69 at 2.) Defendants have filed a counterclaim that is not addressed in this opinion. (*See* D.E. 73.) Before the Court are the parties' cross-motions for summary judgment on Plaintiff's claims (D.E. 100; D.E. 111); the parties' motions to strike evidence submitted in support of summary judgment (D.E. 120; D.E. 129); and the parties' motions to strike each other's expert testimony (D.E. 121; D.E. 136; D.E. 140). For the reasons discussed below, the motions for summary judgment are denied, the motions to exclude expert testimony are granted in part and denied in part, and the motions to strike other evidence are dismissed as moot in light of the summary judgment denial, which is based on evidence either not challenged by either party, or else deemed admissible by the Court despite a party's challenge. (D.E. 99, 110, 129, 135, 138.)

## FACTS

The Court takes the facts from the parties' respective Rule 56.1 Statements. (*See* D.E. 101; D.E. 112; D.E. 113; D.E. 118.) Where the parties disagree over relevant facts, the Court sets forth the competing versions. In addition, the Court resolves genuine factual ambiguities in

the respective nonmovant's favor.

Local Rule 56.1 ("L.R. 56.1") requires that statements of facts contain allegations of material fact, and the factual allegations must be supported by admissible record evidence. *See* L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583–85 (N.D. Ill. 2000). The Seventh Circuit teaches that a district court has broad discretion to require strict compliance with L.R. 56.1. *See, e.g., Koszola v. Bd. of Ed. of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995) (collecting cases)). Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement. *See, e.g., Malec*, 191 F.R.D. at 583 ("[A] movant's 56.1(a) statement should contain only factual allegations. It is inappropriate to allege legal conclusions."); *id.* ("Factual allegations not properly supported by citation to the record are nullities."). Additionally, where a party has improperly denied a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems admitted that statement of fact. *See* L.R. 56.1(a), (b)(3)(B); *see also Malec*, 191 F.R.D. at 584. The Court disregards any additional statements of fact contained in a party's response rather than its statement of additional facts. *See Malec*, 191 F.R.D. at 584 (stating that the L.R. 56.1(b)(3)(B) statement is the only acceptable means of presenting additional facts to the Court).

**The Parties**

This case is about a small company that alleges it was cut out of a deal by two larger companies, after the smaller company brought the two larger companies together to do business. The Plaintiff, Amakua Development LLC, is a Nevada limited liability company whose sole member is Michael Scofield, a Nevada resident. Amakua allegedly was formed for the purpose

of "consulting, identifying, developing and transacting" in hotel properties. (D.E. 101 ¶¶ 1, 8.) However, neither Scofield nor Amakua has a real estate broker's license (D.E. 112 ¶ 9), and Amakua has never closed any real estate transaction involving a resort or hotel property—either as a broker or as a principal/equity owner (D.E. 112 ¶ 11). Moreover, Amakua has no assets or capital, and it has never received a loan from any lender. (D.E. 112 ¶ 16.)

Defendant Ty Warner, an Illinois resident, is the sole member of Defendant Warner Hotels & Resorts LLC, a Delaware limited liability company. Mr. Warner also heads Ty Inc., a Delaware corporation with its principal place of business in Illinois. (D.E. 112 at 5.) Defendant JTL is a Texas limited liability company whose only members, David Lane and Mark Sullivan, are Texas residents. (D.E. 101 ¶ 5.)

### Amakua's Proposed Transaction

Through a variety of introductions, representatives of Amakua met John Hong, Ty Warner's principal adviser for business affairs, and David Lane, JTL's principal. Through these introductions, Amakua had become aware of the Warner Defendants' desire to buy a hotel, and JTL's desire to sell one. Defendant JTL was under contract to purchase a hotel in Mexico called Las Ventanas al Paraiso Hotel and Resort ("Las Ventanas") from a prominent Mexican family (the "Burillo family") for $68 million. (D.E. 101 ¶ 13.) JTL's Lane agreed to talk to Scofield after another potential buyer, Omni Hotels, decided not to pursue the deal and Omni's vice president of development, Scott Johnson, referred Lane to Scofield. (D.E. 101 ¶ 18; D.E. 112 ¶ 30.) In response to discussions with Scofield, Lane sent Scofield an offering memorandum on the property and some information about potential financing from Morgan Stanley. (D.E. 112 ¶ 33.) Scofield then "took the Las Ventanas opportunity" to Hong. (D.E. 101 ¶¶ 19–20.)

**The Noncircumvention Agreement**

Around September 18, 2003, Greg Blake, one of Amakua's two agents, called Hong to determine if Mr. Warner[1] was interested in purchasing the hotel portion of Las Ventanas. (D.E. 118 ¶ 35.) Hong expressed interest, and a day or two later Amakua faxed Hong the Noncircumvention Agreement at issue in this case, which Hong signed. The Agreement stated that Amakua would provide confidential information about the hotel property to Warner in exchange for a promise that Warner would not "circumvent" Amakua in any eventual purchase of the hotel. (*See* D.E. 75 ¶ 18; Ex. 1025 ¶ 1.) The noncircumvention provision of the Agreement stated, in its entirety: "Specifically 'Hong' agrees to refrain from circumventing 'Amakua' in any dealings either directly or indirectly." (Ex. 1025 ¶ 10.)

Defendants argue that Hong signed the agreement because Amakua told Hong it represented the seller and that it "controlled the deal." (D.E. 112 ¶ 36.) Amakua disputes this statement as untrue. (D.E. 118 ¶ 36.) Defendants state that the parties never discussed or negotiated the Noncircumvention Agreement or any of its provisions, and that it does not contain a compensation provision. (D.E. 112 ¶¶ 38, 39.) Defendants' chief argument against enforcement of the Noncircumvention Agreement, however, is that it constitutes brokerage activity, which was illegal on Amakua's part because neither Amakua nor Scofield is a licensed real estate broker. (D.E. 112 ¶ 9.) Defendants also assert that a "principal," as opposed to a

---

[1] Throughout their L.R. 56.1 Statements, the parties disagree about whether Hong was working on behalf of Mr. Warner, in his individual capacity, or Warner Hotels & Resorts, LLC. (*See, e.g.*, D.E. 113 ¶ 31.) Hong signed the Noncircumvention Agreement as "Principal Advisor/Business Affairs" without stating whether he was signing on behalf of Mr. Warner or Warner Hotels. Hong stated in response to Plaintiff's interrogatories that he was acting on behalf of Warner Hotels, *see* D.E. 113 at 12 (citing Pl.'s Ex. 345 at 191), but Plaintiff has variously asserted that Hong purported to be working on behalf of Mr. Warner individually, *see, e.g.*, D.E. 118 ¶ 24.

"broker," does not rely on noncircumvention agreements "because [a principal, unlike a broker, has] no fee or commission to protect." (D.E. 112 ¶ 13 (citing Ex. 365, Morone Expert Report at 5).) Amakua disputes this as well, stating that "[p]articipants in the acquisition of real estate are well aware that they could be circumvented by the capital-heavy entity in a transaction. Thus, it is common to require a non-circumvention promise to prevent being 'cut out of the deal.'" (D.E. 118 ¶ 13 (citing Ex. 1061, Robinson Decl., at 2, 6–7).) This assertion comes from Plaintiff's putative damages expert, Maurice Robinson. As discussed below, this opinion of Mr. Robinson's is stricken from the record because it is beyond the scope of Mr. Robinson's expertise. However, because the Court has denied the parties' cross-motions for summary judgment—based on much more than just this purported dispute of fact—this admission is not outcome determinative. The Court includes this dispute only to demonstrate how thoroughly the parties dispute the material facts of the case.

After Hong signed the Noncircumvention Agreement, Amakua provided him with the identities of JTL and David Lane, with details of a Revised Management Contract that JTL was negotiating with Rosewood Hotel Company, with two pages of historical and projected financial information about Las Ventanas, and with David Lane's private cell phone number. (D.E. 101 ¶¶ 33, 35, 37, 38.) Beyond these facts, much is disputed about the details surrounding the execution of the Noncircumvention Agreement, including whether Amakua described to Hong the nature of JTL's contract with the Burillo family or JTL's earlier failed negotiations with Omni Hotels, and whether Amakua itself created any of the financial information it provided to Hong or simply forwarded financial information it had received from JTL. (*See id.* ¶¶ 34, 36; D.E. 113 ¶¶ 34, 36; D.E. 112 ¶ 40; D.E. 118 ¶ 40.)

**The Facilitation Agreement**

On September 23, 2003, Scofield drafted and sent to Lane a two-page Facilitation Agreement, which attempted to memorialize a deal with JTL regarding the sale of Las Ventanas in a "dual escrow" transaction for $70.25 million. (D.E. 112 ¶ 45.) The Agreement states: "Broker [Amakua] shall earn its commission, which shall be defined as the difference between the Gross Sales Price and the Client's Purchase Price. ('Client Price') This amount will include any and all cash as well as any and all real estate not included in client's asset list." (Ex. 1023 at A0144.) Further, the Agreement states:

> It is understood and agreed that Buyer [JTL] is willing to complete the transaction with what is commonly referred to as a dual escrow whereby, Buyer will be a party to two separate escrows, one for the purchase of the Property from the current owners, and one for the sale of the Property to the Client. Buyer will act as facilitator for these transactions and will have no rights to negotiate or accept any other price from Client unless receiving prior approval from Broker.

(*See id.* at A0144–A0145.) The parties disagree about whether the Facilitation Agreement established that Amakua was to be a "broker" or a "principal" in the deal, and whether the Facilitation Agreement contemplated a "flip" of the property or some other arrangement. The parties also disagree about the meaning of the terms "broker," "principal," and "flip." (D.E. 118 ¶ 46; D.E. 112 ¶ 51 (citing Ex. I, Wallace Dep. at 190:1–191:9 (stating that agreements entitling a broker to a commission in the amount the sales price exceeds the list price is known as a "net listing agreement," not a flip)); Ex. 1023 at A0143; D.E. 112 ¶ 14; D.E. 118 ¶ 14; D.E. 118 ¶ 51 (citing Robinson Dep. 333:5–334:5 ("In most of the flips that I've heard of, the flipper really doesn't put in any significant amount of equity.")).) The deal expressed in the Facilitation Agreement is the only deal that Amakua tried to negotiate in writing with JTL. (D.E. 112 ¶ 50.)

On September 24, 2003, Lane rejected the Facilitation Agreement, without knowing who Amakua's client was. (D.E. 112 ¶¶ 52, 53.)

### Interactions Between the Warner Defendants and JTL

After Lane rejected the Facilitation Agreement, he stopped returning Scofield's phone calls. (D.E. 112 ¶¶ 58, 59, 61.) Meanwhile, Hong requested that Amakua set up a meeting with Lane. (D.E. 112 ¶ 60.) Because Scofield could not get Lane on the phone, Hong ultimately called Lane himself, at the cell phone number Scofield had given him. Hong arranged a meeting between Lane and Warner that took place at Las Ventanas on October 1, 2003. (D.E. 101 ¶ 39.) Following this meeting, Hong informed Scofield that the Warner Defendants were no longer interested in Las Ventanas. However, negotiations between JTL and the Warner Defendants continued, in fits and starts, throughout the rest of the year and into 2004. After many stalls in the negotiation process, Warner Hotels purchased Las Ventanas, after JTL had purchased it from the Burillo family in a joint venture with Farallon Capital. The new owners marketed the property to Warner Hotels via Secured Capital in an open auction. Defendants argue that this sale was completely separate from the deal proposed by Amakua; Amakua disagrees. The parties agree that Amakua played no part in the transaction, and received no compensation from it. (D.E. 112 ¶¶ 72, 77, 78, 79, 82, 86, 88; D.E. 101 ¶¶ 46, 47, 48, 49; Pls. Ex. 206; D.E. 101 ¶¶ 51–54, 55, 56.)

## DISCUSSION

The Court addresses the parties' motions to strike expert testimony first, followed by the parties' cross-motions for summary judgment. The Court has considered the parties' remaining motions to strike evidence in support of the summary judgment motions in reaching its conclusions, but does not issue separate rulings on each of those paragraph-by-paragraph

8

disputes. Moreover, these motions/disputes are, for practical purposes, moot, inasmuch as the Court would deny the summary judgment motions based on broader evidentiary disputes. In other words, even if the Court granted the parties' motions to strike this additional evidence, the Court would still deny summary judgment based on the substantial disputes of material fact.

## I.    Motions to Strike Expert Testimony

### A.    Standards for Admitting Expert Testimony

Precedent teaches that a district court judge is to act "as a 'gatekeeper' for expert testimony, only admitting such testimony after receiving satisfactory evidence of its reliability." *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 869 (7th Cir. 2001) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)); *see also DataQuill Ltd. v. Handspring, Inc.* No. 01 C 4635, 2003 WL 737785, at *1 (N.D. Ill. Feb. 28, 2003). Admissibility of expert testimony is governed by Fed. R. Evid. 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Daubert* held that Rule 702 requires the trial judge to ensure "'that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (quoting *Daubert*, 509 U.S. at 589).

To gauge reliability, the court must determine whether the expert is qualified in the relevant field, and whether the expert's reasoning or methodology is valid. *See Richman v. Sheahan*, 415 F. Supp. 2d 929, 934 (N.D. Ill. 2006) (citing *Daubert*, 509 U.S. at 592–93, and *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005)). All purported expert opinions are

governed by the *Daubert* standard, whether the opinion relates to "areas of traditional scientific competence or whether it is founded on engineering principles or other technical or specialized expertise." *Smith*, 215 F.3d at 719 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)). An expert may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "'[E]xtensive academic and practical expertise' in an area is certainly sufficient to qualify a potential witness as an expert," *Smith*, 215 F.3d at 718 (quoting *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000)), and Rule 702 specifically contemplates the admission of testimony by expert witnesses who are qualified based on experience alone. *See, e.g., Kumho Tire*, 526 U.S. at 156; *Walker v. Soo Line R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000). Thus, a court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether the expert is qualified to render an opinion in a given area. *See, e.g., Smith*, 215 F.3d at 718. Furthermore, an expert's "competence in the general field . . . [at issue] must extend to his specific testimony on the matter" before the Court. *Ty, Inc. v. Publications Int'l, Ltd.*, No. 99 C 5565, 2004 WL 2359250, at *5 (N.D. Ill. Oct. 19, 2004) (Zagel, J.); *accord, e.g., Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990) (citing *Gladhill v. Gen'l Motors Corp.*, 743 F.2d 1049, 1052 (4th Cir. 1984)). As the Seventh Circuit has explained, even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are" well-founded and comport with the requirements of, *inter alia*, *Daubert*. *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999); *accord Smith*, 215 F.3d at 718 (citing *Takata Corp.*, *supra*).

The Seventh Circuit has emphasized, however, that "the court's gatekeeping function focuses on an examination of the expert's methodology. The soundness of the factual

underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith*, 215 F.3d at 718 (citing *Daubert*, 509 U.S. at 595, and *Walker*, 208 F.3d at 587); *see also Smith*, 215 F.3d at 719 ("It is not the trial court's role to decide whether an expert's opinion is correct. The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound.") (citation omitted). *Daubert* listed several factors that may illuminate the analysis of an expert's methodology, but it emphasized that they were merely guides, that they were not meant to serve as a series of prerequisites, and that their applicability depended on the particular facts of each case.[2] *See Daubert*, 509 U.S. at 594–95; *United States v. Cruz-Velasco*, 224 F.3d 654, 660 (7th Cir. 2000) (collecting cases).

Finally, a district court must determine whether the proposed expert testimony is relevant, *i.e.*, whether it would assist the trier of fact in understanding the evidence or determining a fact in issue. *See* Fed. R. Evid. 702. Expert testimony does not assist the trier of fact when the jury is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony. *See Taylor v. Illinois Cent. R.R. Co.*, 8 F.3d 584, 586 (7th Cir. 1993) (citation omitted); *accord, e.g., Hoffman v. Caterpillar, Inc.*, 368 F.3d 709, 714 (7th Cir. 2004) (affirming the district court's exclusion of a purported expert's opinion based upon a videotape because "the videotape could be played for the jury and entered into evidence,

---

[2] The factors listed in *Daubert* include: (1) whether the theory or technique can be and has been verified by the scientific method through testing; (2) whether the theory or technique has been subject to peer review and publication; (3) the known or potential rate of error of the technique; and (4) whether the theory or technique has been generally accepted by the relevant scientific community. *See id.*, 509 U.S. at 590–91.

and consequently, jurors could make a determination for themselves . . . . Based upon this independent assessment . . . . the jury could then draw [its own] inferences . . . . and expert testimony would be of no help.").

Where an expert's hypothetical explanation of the possible or probable causes of an event would aid the jury in its deliberations, that testimony satisfies *Daubert*'s relevancy requirement. *See Smith*, 215 F.3d at 718–19 (citing *Walker*, 208 F.3d at 589–90). However, these hypothetical alternatives must themselves have "analytically sound bases" so that they are more than mere "speculation" by the expert. *Smith*, 215 F.3d at 719 (quoting *DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998)).

The party offering the expert's testimony must establish by a preponderance of the evidence that the expert testimony is admissible and that the expert is qualified. *See Daubert*, 509 U.S. at 593; *see also Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) ("[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable.") (citation omitted). However, the question of whether an expert is "credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based." *Smith*, 215 F.3d at 719. In this regard, "[v]igorous cross examination, presentation of contrary evidence and careful jury instructions . . . are the traditional and appropriate means of attacking shaky but admissible evidence." *Richman*, 415 F. Supp. 2d at 933 (citing, *inter alia*, *Daubert*, 509 U.S. at 596).

## B.     Clark E. Wallace

Plaintiff moves to strike the expert report and opinions of Clark E. Wallace. (D.E. 121.)

Plaintiff argues primarily that his opinions embody legal conclusions and are therefore irrelevant

to the factfinder's analysis of factual issues, but Plaintiff also argues that Mr. Wallace's report is

unreliable because it is based on the *ipse dixit* of the expert instead of sound methodology. (*See*

D.E. 121 at 6.) Defendants respond that Mr. Wallace's report addresses applicable professional

standards and a party's performance in light of those standards, and therefore is admissible. (*See*

D.E. 134 at 4.) Defendants retained Mr. Wallace to address two issues: (1) whether Amakua and

its agents acted as a "broker" in the proposed deal with the Warner Defendants and JTL, and (2)

whether Amakua was a putative "principal" in the deal.  These questions are relevant because, as

both sides acknowledge, if Amakua was acting as a broker when it brought Warner and JTL

together, then the Noncircumvention Agreement is likely unenforceable due to illegality because

Amakua did not have a real estate license.  For the reasons discussed below, the Court grants in

limited part and denies in large part Plaintiff's motion to strike Mr. Wallace's report and

opinions.

### 1.     Qualifications

The first question is whether Mr. Wallace is qualified to be an expert in this case.  Mr.

Wallace previously served as the Commissioner of Real Estate for the State of California

(1991–94), in which position he oversaw the regulation of 375,000 real estate licensees, both

brokers and salespersons. (*See* D.E. 134-2 at 6.)  In that capacity, it was part of his job

responsibility to interpret and apply real estate custom, practice, standards of care, and

regulations to the conduct of individuals and companies involved in real estate transactions. (*Id.*)

He also has worked as a real estate developer since 1969, and has been a licensed real estate

broker since 1958. (*Id.*) He presently does business by providing consulting services regarding real estate acquisitions, regulation, brokerage standard of care, and matters related to the California Department of Real Estate. (*Id.*) He states in his report that he has been qualified as an expert witness in numerous cases. (*See id.*) His experience is primarily in commercial real estate development. (*See* D.E. 134-10 at 8 (Ex. C, Wallace Dep. at 92:13).) He has purchased commercial real estate as a principal "hundreds" of times. (*Id.*) Moreover, Mr. Wallace has "brokered" several commercial real estate transactions. (*See* D.E. 134-10 at 8 (Ex. C, Wallace Dep. at 91:15).) Mr. Wallace has testified before Congress; before various state legislative committees or regulatory bodies; and before various city councils, boards of supervisors, planning commissions, etc. (on hundreds of occasions) in connection with real estate matters. (D.E. 134-4 at 6.) The Court finds that Mr. Wallace's experience qualifies him to testify in this case, because his experience as a commercial real estate developer and as a residential real estate broker allows him to speak to the differences between brokers and principals in the context of real estate transactions, which is relevant to determining whether Amakua was illegally acting as a broker when it entered the Noncircumvention Agreement with the Warner Defendants.

## 2. Methodology

Next, the Court must determine whether Mr. Wallace's methodology is valid. Mr. Wallace's report includes four opinions:

1. Amakua, Scofield, and Amakua's agents did not perform activities as principals in these matters.
2. Amakua, Scofield, and Amakua's agents performed activities that render them brokers under California real estate industry, custom, and practice, and the California Business and Professions Code ("California B&P Code").
3. Amakua, Scofield, and Amakua's agents' activities do not satisfy industry custom and practice or the California B&P Code because: (a) Amakua and Scofield are not licensed in California; (b) Amakua, Scofield, and Amakua's agents failed to

14

carry out duties of disclosure and fair dealing owed to the Warner Defendants; and (c) Amakua, Scofield, and Amakua's agents improperly acted as dual agents.

4. The California B&P Code provides that individuals and companies cannot be compensated where they fail to satisfy licensing requirements.

(*See* D.E. 134-2 at 5 (Wallace Report Executive Summary).) To reach these opinions, Mr. Wallace read the deposition transcripts of Amakua's agents, Doug Owen and Greg Blake, and Amakua's principal, Michael Scofield; he conducted an online license check of Amakua, Scofield, Owen, and Blake through the California Department of Real Estate; he discussed the issues with John Liberator, chief deputy of the Department of Real Estate; and he read various materials from the case that were forwarded to him by defense counsel. (*See* D.E. 134-10 at 3–6.) Mr. Wallace's report states that, "[b]ased upon my extensive knowledge and practice in the real estate industry, I analyzed the activities and conduct of Amakua, Scofield, and Amakua's agents in this case against the real estate industry standard of care in the State of California, including custom and practice, relevant laws and regulations, common law, and industry codes of ethics." (*See* D.E. 134-2 at 7.) He compared the standard of care for real estate licensees in California with the activities of Amakua. (*See id.*)

Plaintiff argues that Mr. Wallace used *no* methods to reach his conclusions—that his opinions "stem[] from the expert's simple *ipse dixit*"—because Mr. Wallace supposedly was unable, in his deposition, to say whether a broker's license would be required in certain other hypothetical situations posed by Plaintiff's counsel. (D.E. 121 at 15–16.) The Court respectfully disagrees. Mr. Wallace's deposition reveals that he did not want to give off-the-cuff answers to counsel's questions, not that he could not answer them or that he was incompetent to speak to issues within his decades of experience. (*See, e.g.,* D.E. 134-12 at 4 (Wallace Dep. at

134:21–136:9); D.E. 134-12 at 8–134-13 at 2 (Wallace Dep. at 153:11–154:19).) This does not meaningfully speak to his methods.[3]

Plaintiff does not otherwise challenge Mr. Wallace's methods on any of the traditional grounds for calling an expert's reliability into question. *See supra*, n.2 (discussing *Daubert*'s four nonexhaustive factors for determining whether an expert's methods are valid). The Court independently finds that Mr. Wallace's report would survive such a challenge to his methods. Because his testimony, like that of the other three experts offered in this case, is not scientific but is based instead on his personal experience in the real estate industry, there is no reason (and perhaps no way) to verify his technique through "scientific testing." In addition, although Mr. Wallace may not have subjected his "theory" or "technique" to peer review and publication (it is not clear from his credentials whether he publishes in his field), this would not appear to be relevant, particularly if he is simply applying standard techniques from his field that do not warrant publication. *See Smith*, 215 F.3d at 720 ("[I]f Muszar was merely applying well-established engineering techniques to the particular materials at issue in this case, then his failure to submit those techniques to peer review establishes nothing about their reliability. Similarly, if Cassassa's accident reconstruction methodology is based on his extensive practical experience in this area, rather than novel methodology subject to publication, his failure to publish does not cast doubt on the reliability of his analytical technique."). Furthermore, Mr. Wallace has qualified repeatedly as an expert witness and has testified before city councils,

_____

[3] At trial, Plaintiff potentially may try to use this testimony to show a lack of broader competence and concomitant lack of credibility. In turn, Defendants will undoubtedly argue that the testimony reflects that Mr. Wallace is a careful and deliberative person who does not shoot from the hip and therefore is more credible. These sorts of credibility assessments are left to the jury, however, under *Daubert*.

16

boards of supervisors, and planning commissions "probably in excess of 500 times over 30-plus years." (See D.E. 134-4 at 6.) He was also involved in developing California's real estate licensee standard of care, and is a periodic participant on California Bar Association panels and in U.C. Berkeley-Boalt Law School real estate law classes. (See id.) These credentials suggest (particularly in light of the fact that they have not been challenged) that Mr. Wallace's methodologies are generally accepted in the real estate field, and that he has extensive practical experience performing those techniques. See Daubert, 509 U.S. at 590–91. The Court concludes that Mr. Wallace's methods are sufficiently reliable for him to testify as an expert.

### 3. Relevance—Legal Conclusions Are Irrelevant

Plaintiff's primary objection to Mr. Wallace's opinions attacks their relevance. Plaintiff argues that Mr. Wallace's opinions consist largely of legal conclusions and therefore are irrelevant insofar as they will not help the trier of fact determine *factual* issues in the case. This objection is overstated, but it is important to delimit the boundaries by which Mr. Wallace will be allowed to testify.

To be sure, "[i]t is black-letter law that 'it is not for witnesses to instruct the jury as to applicable principles of law, but for the judge.'" *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997) (quoting *United States v. Newman*, 49 F.3d 1, 7 (1st Cir. 1995) (internal punctuation omitted)); *see also Naeem v. McKesson Drug Co.*, 444 F.3d 593, 610 (7th Cir. 2006) ("[W]e previously have stated that allowing a witness to testify as to a legal conclusion may cause the jury to accord too much weight to that testimony, and may infer that the jury should look to that witness for legal guidance.") (citations omitted). "The analysis here begins with the proposition that under our system it is the responsibility—and the duty—of the court to state to the jury the meaning and applicability of the appropriate law, leaving to the jury the task of

determining the facts which may or may not bring the challenged conduct within the scope of the court's instruction as to the law." *Adalman v. Baker, Watts & Co.*, 807 F.2d 359, 366 (4th Cir. 1986), disapproved on other grounds, *Pinter v. Dahl*, 486 U.S. 622 (1988); *see also Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005) (citing *Adalman* for the rule that expert's cannot testify regarding legal conclusions). Because the jury does not decide pure questions of law, expert testimony on the law is not helpful to the jury and so does not fall within the terms of Fed. R. Evid. 702, which allows expert testimony "'[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Nieves-Villanueva*, 133 F.3d at 100 (quoting Rule 702). This is because the judge's expert knowledge of the law makes any such assistance at best cumulative, and, at worst, prejudicial. *See id.*, 133 F.3d at 100 (collecting authorities). "It is not the common knowledge of the jury which renders the witness' opinion unnecessary, but the special legal knowledge of the judge." *Id.*, 133 F.3d at 100 (citation and internal quotation marks omitted).

Fed. R. Evid. 704(a), which removes the common-law bar on "otherwise admissible" testimony that "embraces an ultimate issue to be decided by the trier of fact," is not to the contrary. Rule 704(a) allows the expert to offer *factual* conclusions to aid the jury—which can choose to accept or reject them—but Rule 704 "should not, and does not, permit the expert witness to usurp the province of the judge." *Adalman*, 807 F.2d at 368. *Legal* conclusions are for the judge; they are not "to be decided by the trier of fact," and therefore do not fall under Rule 704. *See Nieves-Villanueva*, 133 F.3d at 100.

Case law instructs, however, that there is a fine line between legal conclusions and factual conclusions:

The line we draw here is narrow. We do not exclude all testimony regarding legal issues. We recognize that a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible. Indeed, a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms. For example, we have previously held that a court may permit an expert to testify that a certain weapon had to be registered with the Bureau of Alcohol, Tobacco, and Firearms. *United States v. Buchanan*, 787 F.2d 477, 483 (10th Cir. 1986). In that case, however, the witness did not invade the court's authority by discoursing broadly over the entire range of the applicable law. Rather, the expert's opinion focused on a specific question of fact.

*Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988) (further citations omitted).

These cases demonstrate that an expert's testimony is proper under Rule 702 if the expert does not attempt to define the legal parameters within which the jury must exercise its fact-finding function. However, when the purpose of testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based, the testimony cannot be allowed. In no instance can a witness be permitted to define the law of the case.

*Id.* at 809–10.

Often, the same information can be elicited as a fact where it would be inadmissible in the guise of a legal conclusion. For instance, where a court excluded an expert's testimony that the plaintiff had been "discriminated against because of her national origin," the court "emphasize[d] that a more carefully phrased question could have elicited similar information and avoided the problem of testimony containing a legal conclusion. The defendants could have asked Dr. Quiroga whether she believed Torres' national origin 'motivated' the hiring decision." *Torres v. County of Oakland*, 758 F.2d 147, 151 (6th Cir. 1985); *see also Marx & Co. v. The Diner's Club, Inc.*, 550 F.2d 505, 512 (2d Cir. 1977) ("The expert, for example, may tell the jury whether he thinks the method of [securities] trading was normal, but not, in our view, whether it amounted to illegal manipulation under Section 9 of the Securities Exchange Act of 1934."). In *Marx*, the court excluded testimony of a securities law expert that related to the construction of a contract between the parties and the validity of certain defenses advanced by Diner's justifying

19

its performance under the contract. *See id.*, 550 F.2d at 508–09. The court stated: "Testimony concerning the ordinary practices of those engaged in the securities business is admissible under the same theory as testimony concerning the ordinary practices of physicians or concerning other trade customs: to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry." *Id.* (citations omitted). "In the case at bar, however, witness Friedman's objectionable testimony did not concern only the customary practices of a trade or business. Rather, he gave his opinion as to the legal standards which he believed to be derived from the contract and which should have governed Diners' conduct. He testified not so much as to common practice as to what was necessary 'to fulfill the covenant' [of the contract]." *Id.*

The advisory committee's note to Rule 704 offers similar advice:

> Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day. They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria. Thus the question, "Did T have capacity to make a will?" would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" would be allowed.

Fed. R. Evid. 704 advisory committee's note; *see also Burkhart v. Washington Metropolitan Area Transit Authority*, 112 F.3d 1207, 1212 (D.C. Cir. 1997) (quoting same); *Hygh v. Jacobs*, 961 F.2d 359, 363–64 (2d Cir. 1992) (quoting same). "In other words, an expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied." *Burkhart*, 112 F.3d at 1212–13.

"There is no doubt that under Rules 702 and 704 an expert may testify about applicable professional standards and the defendants' performance in light of those standards." *Richman*,

415 F. Supp. 2d at 945; *see id.* at 946 & n.16 (collecting cases). "Cases like the instant one, at first blush, seem difficult, because the relevant professional standards are drawn in part from the applicable law and the terms in which they are expressed." *Id.*

> Where the testimony contains terms that have a separate, distinct, and specialized meaning in the law different from that present in the vernacular, the testimony may be deemed to constitute a legal conclusion and exclusion would not be inappropriate. However, where, as here, the word also has an everyday meaning, the testimony should not be excluded as constituting a legal conclusion. . . . Even if the everyday understanding of a term and its legal meaning are congruent, exclusion is inappropriate where the opinion will not consist of a naked conclusion (i.e., the defendant's conduct was reasonable, was negligent, etc.) but will be based on "adequately explored legal criteria." That is, they will explain the reasons underlying the ultimate conclusion. Moreover, the court will instruct the jury on the appropriate meaning of the legal standard and that the jury is free to reject the testimony of the expert. Consequently, the risk of jury confusion is not present.

*Id.* at 947–48.

In this case, the Court finds that some of Mr. Wallace's opinions—as written in his expert report—appear to be legal conclusions, or conclusions of mixed law and fact. These are likely problematic.[4] He states, for example, that particular provisions of California law state that a real estate brokerage license is required in certain defined situations, quoting directly from California Business and Professions Code Section 10130 as the basis for his conclusion. (D.E. 134-2, Ex. A at 5.) Mr. Wallace also appears to elucidate applicable legal principles by which agency is

---

[4] *Daubert* motions can be helpful in broad terms to exclude patently unqualified experts, or to exclude purveyors of "junk science" who offer no credible methodology for their purportedly "expert" views. That is not the situation here, as explained above. Instead, the *Daubert* challenge to Mr. Wallace here, to the extent it has potential traction, relates to issues that need to be assessed on a question-by-question basis, with the appropriate answer turning on the precise language of the question posed and the context in which it is asked at trial. As a result, the Court cannot sensibly attempt to turn Plaintiff's *Daubert* motion into an omnibus motion in limine concerning Mr. Wallace's fourteen-page, single-spaced report. Therefore, the Court articulates only the broad principles by which Mr. Wallace's testimony will be excluded or admitted at trial.

established. (*See* D.E. 134-3, Ex. A at 6 ("Ostensible or implied agency can be created from the actions and conduct of the parties/licensees.").) Mr. Wallace also states that the receipt of secret profits by a real estate broker violates Section 10176(g) of the California Business and Professions Code. (*Id.*, Ex. A at 12.) These conclusions or assertions are legal ones and therefore would be inadmissible if elicited as such by defense counsel. They are like responses to the question, "Does T have the capacity to enter a will?" *See Marx*, 550 F.2d at 508–09; Fed. R. Evid. 704 advisory committee's note. They are issues that should be addressed by jury instructions from the Court, not by an expert's testimony.

However, Mr. Wallace also offers factual conclusions that are based on legitimate foundations (if credited by the jury) and that are the product of reliable methods. The fact that those factual conclusions are structured so as to conform to applicable underlying principles of California law is not exceptional; if the factual assertions were unmoored from the underlying legal framework, they would be potentially irrelevant and/or misleading. For example, Mr. Wallace addresses the standards that govern real estate brokers in California, and what kinds of activities make someone a "broker." His opinions are based on years of experience in the real estate industry. In assessing whether Amakua and its agents were acting like real estate brokers when they entered the Noncircumvention Agreement (as well as whether Defendants were entering a "brokerage agreement"), these factual conclusions may be helpful to the trier of fact. Although Mr. Wallace may not testify to the ultimate legal conclusion that Amakua and its agents *were* illegal brokers when they entered the Noncircumvention Agreement, he may testify as to what activities, in his experience, constitute brokering, as opposed to acting as a principal, and whether Amakua's activities were more like that of a broker than of a principal. The latter is more like the answer to the fact question, "Did T have sufficient mental capacity to know the

22

nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" than the legal question, "Did T have capacity to make a will?" *See* Fed. R. Evid. 704 advisory committee's note. This sort of testimony is admissible.

## C. Thomas F. Morone

Plaintiff also moves to strike the expert report and opinions of Thomas F. Morone. Much of the analysis with respect to the admissibility of Mr. Wallace's expert testimony also applies to Mr. Morone. As with Mr. Wallace, Defendants retained Mr. Morone to render an opinion on whether Amakua was acting as a broker or a principal in the proposed transaction with the Warner Defendants and JTL. As with Mr. Wallace, Plaintiff moves to strike two of Mr. Morone's opinions on the basis that they offer legal conclusions. (*See* D.E. 121 at 16–18.) Plaintiff moves to strike Mr. Morone's remaining three opinions because they are "unreliable and/or irrelevant." (*See id.* at 18.) The Court respectfully grants in part and denies in part Plaintiff's motion to strike Mr. Morone's expert testimony.

### 1. Qualifications

Like Mr. Wallace, Mr. Morone is qualified as an expert in this case based on his experience in the real estate business. Mr. Morone is a principal in Warnick & Company, a consulting and investment banking firm that specializes in the recreational real estate and hospitality facility business. (*See* D.E. 134-6 at 5.) He has 35 years of experience in the hotel industry and a bachelor of science degree in hotel administration. (*See id.*) He has represented many types of buyers and sellers as a consultant and as a broker, including large institutions and real estate investment trusts. (*See id.* at 6.) In addition, he has experience in hospitality management and operations, as well as corporate real estate development. (*See id.*) He has testified as an expert witness (including in arbitrations) roughly half a dozen times. (*See* D.E.

134-16 at 5 (Ex. D, Morone Dep. at 12:20–12:23).) Mr. Morone has worked primarily in

California (*see* D.E. 134-7 at 2–7), and his experience is sufficient to qualify him to testify about

the transaction Amakua proposed to the Warner Defendants and JTL, and the nature of

Amakua's role in that transaction.

## 2. Methodology

Mr. Morone's report includes five opinions:

1. Based upon my experience in the hospitality real estate industry, the proposed Confidential Non-Disclosure and Non-Circumvention Agreement is missing essential terms.
2. The sale transaction through which Ty purchased Las Ventanas was a completely separate real estate transaction from the sale Amakua had proposed.
3. Amakua was acting as a real estate broker in connection with the Las Ventanas transaction.
4. The information that Amakua represented as Confidential was already in the public domain and in the possession of Ty before Amakua delivered it to Ty.
5. Amakua lacked the experience and wherewithal to consummate the transaction to acquire the Hotel.

(*See* D.E. 134-6 at 5.) Mr. Morone states in his report that he arrived at these opinions by

"us[ing] my background, training and experience in the hospitality real estate industry to analyze

the relationship between . . . [Amakua] and . . . [Warner] and . . . [JTL] as described in the

Facilitation Agreement and the Confidential Non-Disclosure and Non-Circumvention Agreement

. . . relative to the ultimate sale of the" Las Ventanas property. (*Id.*) As discussed above with

respect to expert Mr. Wallace, Mr. Morone's methods are also valid. He has based his opinions

on his specialized experience in a field relevant to the issues of this case, as applied to the facts

of this case. This satisfies the "reliable principles and methods" requirement of Rule 702. *See*

*Kumho Tire*, 526 U.S. at 126; *Walker*, 208 F.3d at 591.

### 3. Relevance

As with Mr. Wallace, Plaintiff challenges the relevance of two of Mr. Morone's opinions to the extent they offer legal conclusions (opinions 1 and 3 above). And, as with Mr. Wallace, the analysis of the admissibility of expert legal opinions applies equally to Mr. Morone. For example, he will not be allowed to testify that the Confidential Non-Disclosure and Non-Circumvention Agreement is unenforceable at law because it lacks essential terms; however, he can explain that, based on his experience, he believes that the Agreement fails to address certain issues and further explain why—again, based on his experience—those issues can be significant ones in the real estate transaction context. A jury cannot credibly be expected to intuit what other issues might be germane to transaction-participants in the commercial real estate context, nor to guess at how common such contractual terms are in the industry. Such opinion testimony is relevant to the issues in this case, because if the jury finds that the Agreement lacks common, significant terms, then the jury itself can conclude whether or not the agreement is unenforceable.

With respect to Mr. Morone's three remaining opinions (that the ultimate sale of Las Ventanas was "completely separate" from the transaction Amakua proposed, that the information Amakua represented as confidential was already in the public domain, and that Amakua lacked the experience and wherewithal to consummate the transaction), Plaintiff argues that they are unreliable and/or irrelevant. (D.E. 121 at 18–19.) Plaintiff argues that Mr. Morone's opinion that the ultimate sale of Las Ventanas to Warner Hotels & Resorts was a separate transaction from the one Amakua proposed "is not an opinion, but a statement of fact" that Mr. Morone is unqualified to make because he does not have personal knowledge as required by Fed. R. Evid. 602. (D.E. 121 at 18.) But, as an expert, Mr. Morone is not required to have personal knowledge of the facts as a transaction participant. He can base his expert opinion on his expertise as

25

applied to the facts (or hypothetical facts) as presented by the party who retained the expert. That is legitimate expert testimony and one of its chief distinctions from "fact" testimony. Moreover, Mr. Morone's long experience in the real estate business qualifies him to testify about whether a transaction like this one qualifies as "separate" from the one proposed by Amakua in that the ultimate transaction had nothing to do with the deal originally proposed by Amakua. Amakua is free, of course, to challenge this opinion on cross-examination.

With respect to Mr. Morone's opinion that the Las Ventanas financial information Amakua provided to the Warner Defendants was already in the public domain, the Court is inclined to agree with Plaintiff that this opinion should be excluded because it does not apply Mr. Morone's expertise to the facts of the case. At least as framed in the briefs, the proposed testimony seems merely to reiterate the facts as Defendants view them. For example, Mr. Morone's report states that "[t]he Las Ventanas financial information actually provided to Ty was not confidential because virtually the same information was already in Ty's files. This is so because in April 2003—before Hong received the 'confidential' information from Amakua in September 2003—Ty had already received a copy of a comprehensive offering memorandum detailing Las Ventanas from Greg Rice, [who] himself received it from JMJ Holdings." (D.E. 134-6 at 13 (Morone Report).) Mr. Morone then states that his opinion that the financial information was not confidential is "[b]ased on my experience in working with similar agreements." (D.E. 134-6 at 14.) But this does not save this opinion, which is essentially just an assertion of fact. The jury does not need Mr. Morone's expertise to understand this bit of evidence. A layperson is quite capable of understanding—based on the testimony of proper fact witnesses or the introduction of other documentary evidence, which Defendants will be allowed to introduce—whether the Warner Defendants already possessed the financial information in

question, and therefore whether that information was "confidential" when Amakua provided it to them.

As for Mr. Morone's final opinion, that Amakua did not have the experience or wherewithal to consummate the purchase of the property, the Court finds that Mr. Morone's experience in the industry qualifies him to offer an opinion on this issue. He may testify, based on his experience, about the amount of capital and experience typically required to engage in a deal like the one in question. Again, Plaintiff is free to challenge that opinion on cross-examination.

In summary, Plaintiff's motion to strike Mr. Morone's expert opinions is granted in part and denied in part. Mr. Morone may not offer bare legal conclusions, nor may he testify about whether the financial information Amakua provided was "confidential." But he may offer opinions about what sorts of activities make a person or entity a "broker," whether the sale of Las Ventanas was separate from the transaction proposed by Amakua, and whether Amakua had the experience and capital typically necessary to carry off a deal such as this one.

### D.     Maurice Robinson

Plaintiff retained Maurice Robinson to appraise the property involved in Amakua's proposed transaction and to render an opinion on the Plaintiff's damages due to Defendants' alleged breach of the Noncircumvention Agreement. (*See* D.E. 136-2 at 2 (Ex. A) (Robinson's report, stating that he was retained to evaluate what Amakua might have expected to earn if the proposed transaction had occurred near the end of 2003).) Mr. Robinson rendered four opinions in his expert report:

1.     The development and subsequent sale of the 15 residential units that were entitled in the "Phase V" land at Las Ventanas could have yielded approximately $19.8 million.

2. The sale of the three unsold "Phase IV" villas could have yielded approximately $5.8 million.
3. Amakua's "position as a player" in the transaction was "a legitimate effort to fulfill a common role in such mixed-use resort projects."
4. The use of a non-circumvention promise, such as the one Amakua used, was a necessary requirement by Amakua to ensure that its interests were not circumvented by the Warner Defendants. These types of promises are used commonly by the hotel and real estate community.

(See D.E. 136-2 at 3.)

Defendants have moved to strike Mr. Robinson's report and to exclude him from testifying at trial, on grounds that his opinions are based on unsupported assumptions, that they are beyond the scope of his expertise, and that they are irrelevant and speculative. (See D.E. 136 at 4.) The Court agrees in part and disagrees in part.

## 1. Qualifications

Mr. Robinson has been a market and financial consultant to the hotel and real estate industries for more than 25 years. (D.E. 136-2 at 2.) He has conducted appraisals and market feasibility studies for dozens of hospitality properties, including many high-end resorts with related residential developments. (See id.) He is the president of Maurice Robinson & Associates, LLC, which provides advisory services to lenders, investors, public agencies, and developers in the hospitality and real estate industry. (See id. at 13.) Mr. Robinson has a master of public administration degree in municipal finance from the University of Southern California, a B.A. in economics from Macalester College, a professional designation in financial planning from the University of California, Los Angeles, and a California Real Estate Appraisal certificate. (See id.) As a principal with KPMG Peat Marwick, Mr. Robinson was the primary resource in the western United States for hotel development and financing issues, particularly

full-service urban and resort properties. (*See id.* at 12.) KPMG's clients included the Four Seasons, Hilton, Hyatt, InterContinental, and other hotel chains. (*See id.*)

Mr. Robinson is currently the financial advisor to the U.S. National Park Service on concession-related matters, and he has provided appraisal, feasibility, acquisition analysis, lease negotiation assistance and/or expert witness testimony for 35 national park concessions over the past 14 years, including those at Yosemite, Yellowstone, and the Grand Canyon. (*See id.*) He sits on the board of directors and is chairman of the professional conduct committee of the International Society of Hospitality Consultants; and he holds positions with the Counselors of Real Estate, the American Society of Appraisers, the Southern California Mediation Association, and the Forensic Expert Witness Association. (*See id.* at 13.) Since 2001, he has served as an expert witness in numerous courts, arbitral panels, mediations, and depositions. (*See id.* at 14–16.) He is a frequent lecturer at various real estate and hospitality industry-related seminars, and he has published a variety of articles in his field. (*See* D.E. 136-2 at 13.) Based on his background and experience, the Court finds that Mr. Robinson is qualified to testify as an expert in this case with respect to appraisal of the property in question.

## 2. Methodology

Defendants argue that Mr. Robinson's opinions regarding Amakua's "project role" in the transaction and regarding the necessity of the Noncircumvention Agreement are beyond the scope of his expertise. (*See* D.E. 136 at 5–6, 7–8.) Defendants also challenge these opinions, as well as Mr. Robinson's valuation opinions, on reliability grounds. (*See* D.E. 136 at 9, 11–15.) The Court agrees with Defendants that Mr. Robinson's "project role" opinion and his opinion regarding the common use of noncircumvention agreements are beyond the scope of his expertise. The project role opinion is based on a handful of anecdotes and examples (some of

which are of questionable relevance) collected for the purpose of rendering this opinion. The project role opinion is not based on Mr. Robinson's own experience in the hotel industry, and it is not established in Mr. Robinson's report why the examples he lists suggest in any way that Amakua's proposed role in the transaction was a common one. (*See* D.E. 136-2 at 6.) Likewise, Mr. Robinson's noncircumvention agreement opinion is based on anecdotes he collected from others in the field, not his own experience. In this regard, he acknowledged in his deposition that, prior to talking to the ten people he contacted to "educate myself about non-circumvention agreements" (including Mr. Morone, one of the Defendants' experts), he did not know whether there was an industry standard noncircumvention agreement, and had never negotiated or drafted such an agreement, nor participated in a real estate transaction involving such an agreement. (D.E. 136-4 at 7–8 (Robinson Dep. at 77:10–79:25).) Moreover, noncircumvention agreements are not documents he typically uses in his business, nor does he have any opinion about what terms need to be included in a putative noncircumvention agreement. (*See id.* (Robinson Dep. at 79:6–79:25).) Under these circumstances, the Court concludes that Mr. Robinson's opinions on Amakua's project role and on the common use of noncircumvention agreements by entities such as Amakua are beyond the scope of his expertise. These two opinions are therefore excluded from his testimony. In addition, and independently, his attempt to offer "expert" testimony based on interviews of other people who actually may know something about noncircumvention agreements is not permitted. It is undisputed that these putative "interviewees" have not been tendered or qualified as experts in this case by Plaintiff, and also, it appears that none of the "interviewees" actually reviewed the alleged noncircumvention agreement at issue in this case. (*See* D.E. 136-7 at 10 (Robinson Dep. at 208:20–209:3).) A party cannot elide the prerequisites required to qualify such potential expert testimony—*i.e.*, from the interviewees

themselves—through the contrivance of having a person simply call the interviewees and then relate what they have told the interviewer. *See, e.g.*, *Dura Automotive Sys. of Indiana v. CTS Corp.*, 285 F.3d 609, 613-14 (7th Cir. 2002).

Mr. Robinson's valuation opinions, however, appear to be within the scope of his expertise, and properly supported by reliable methodology. Defendants argue that Mr. Robinson's valuation opinions are based on the unsupported assumptions that (a) JTL and the Warner Defendants were willing to do business with Amakua and the transaction Amakua was involved in would have ultimately closed; (b) Amakua had the financial ability to develop and build the residential units that would have made up the property to be sold for the amounts projected by Mr. Robinson; (c) Amakua's closing costs would have been the same as Warner Hotels' costs; and (d) Amakua would have been able to sell the Phase IV villas in the first quarter of 2004. (*See* D.E. 136 at 12.) Defendants argue that there is no evidence in the record supporting any of these assumptions. (*See id.*) The Court respectfully disagrees. Mr. Robinson's report makes clear what record evidence he relies on and how he has calculated the valuations of the property in question. (*See, e.g.*, D.E. 136-2 at 3–5 (Robinson's report, explaining how he determined how many homes could be built on the "Phase V" land and how they should be valued, as well as how he valued the existing "Phase IV Villas").) This methodology is sufficient to support the reliability of Mr. Robinson's testimony. Again, Defendants are free to challenge his conclusions on cross-examination.

### 3. Relevance

Defendants challenge Mr. Robinson's reliance on case law as irrelevant to the trier of fact, both because case law is not information that he usually relies on in his field and because his analysis of legal issues is not appropriate expert testimony, inasmuch as legal questions are for

the court, not the finder of fact. (*See* D.E. 136 at 7.) The Court agrees that, like Mr. Wallace and Mr. Morone, Mr. Robinson should not be allowed to testify about legal conclusions. Therefore, Defendants' motion to strike this aspect of his expert testimony is granted.[5]

## E. Russell W. Mangum

Defendants have also moved to strike the expert report and testimony of Russell W. Mangum, also hired to offer damages opinions for Plaintiff, because his opinions are outside the scope of his expertise, are based on speculation and assumptions, are irrelevant, and otherwise threaten to confuse the issues and mislead the jury. (*See* D.E. 140 at 4.) At the outset, Defendants challenge parts V and VI(A) of Mr. Mangum's expert report because they consist of

---

[5] Defendants also challenge Mr. Robinson's report and opinions because both Mr. Robinson and Plaintiff failed to produce drafts of his report and his notes, in violation of Rule 26. (*See* D.E. 136 at 16.) Plaintiff's counsel asserts that he is engaged in a "meet-and-confer" process with defense counsel to attempt to resolve this aspect of the dispute. (*See* D.E. 150 (affidavit of Pl's. counsel, Daniel Rasmussen); D.E. 151 at 15–16.) Such meet and confer sessions must be exhausted before parties may file discovery motions in this district. *See* Local Rule 37.2. Defendants are free to file a motion to compel in advance of trial, if one is appropriate, and to move to exclude Mr. Robinson at that time if they believe any alleged destruction of evidence has been willful. At a minimum, Plaintiff's counsel certainly should produce the supposed draft copy of the Robinson expert report that they have, and Defendants are free to redepose Mr. Robinson about that draft. *See, e.g., Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 282–83, 290 (E.D. Va. 2001) (discussing obligations to tender draft copies of testifying experts' reports, and discussing significance of such drafts in search for truth). In this regard, the Court notes that the parties appear to dispute whether the duty to disclose such drafts is self-executing, or whether it is triggered by a request from the other side. This debate seems, with all respect, to be misplaced: it is clear that Defendants have requested any drafts, and clear that they cannot be withheld concerning a testifying expert. *See Trigon*, 204 F.R.D. at 282–83; *accord, e.g., W.R. Grace & Co. v. Zotos Int'l, Inc.*, No. 98-CV-838S(F), at *10 (W.D. N.Y. Nov. 2, 2000) (collecting cases). Defendants state that they never received any of the exhibits attached to the Rasmussen Declaration (*See* D.E. 150, Exs. A, I–L) prior to the filing of that Declaration, and that these exhibits should be stricken to the extent Mr. Robinson intends to rely on them. Plaintiff states that these exhibits were not offered in support of Mr. Robinson's opinions, but only in response to Defendants' motion regarding Mr. Robinson's draft report. That being the case, the Court finds that Mr. Robinson may not rely on these exhibits as forming bases for his opinions, as they were filed roughly eighteen months after the discovery cutoff.

"an extensive, multi-page summary of the negotiations between Plaintiff, the Warner Defendants and JTL regarding Las Ventanas," which Defendants argue is "a blatant attempt to bolster Plaintiff's . . . preferred version of the facts." (D.E. 140 at 7.) The Court agrees that the summary of the case included in Mr. Mangum's report is lengthy, and that Plaintiff should not expect to question Mr. Mangum at length at trial in a manner that would suggest that Mr. Mangum has any direct knowledge of the underlying disputed facts.[6] However, Plaintiff may elicit from Mr. Mangum his general understanding of the facts, in the context of determining what materials he reviewed to render his opinion and in the context of demonstrating the factual predicates upon which his conclusions rest. (Defendants are also free to question Mr. Mangum about those factual predicates; such questioning is common, because a litigant typically wants the jury to appreciate that if the factual bases for the opposing expert's conclusions are not accepted by the jury within the universe of disputed factual contentions, then the expert's conclusions similarly are eroded.) Likewise, to the extent that parts of Mr. Mangum's opinion offer legal conclusions or interpretations of the Noncircumvention Agreement, he will not be allowed to testify to those conclusions or interpretations.

### 1. Qualifications

Mr. Mangum is an economist who holds a Ph.D. and an M.S. in economics from the University of Southern California, as well as a B.A. in economics, with honors, from California State University, Fullerton. (*See* D.E. 141-2 at 2.) He is a vice president of Analysis Group, Inc., an economic, financial, and strategic consulting firm. (*See id.*) He is a member of several

---

[6] This factual recitation also may not be introduced as an exhibit. *Accord, e.g., Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468-69 (S.D.N.Y. 2005) (collecting cases).

professional associations, including the American Economic Association, the Intellectual Property Law Association, and the American Bar Association. (*See id.*) Prior to joining Analysis Group, Inc., he was an economist at the U.S. Federal Trade Commission, Bureau of Economics, Antitrust Division. (*See id.*) His professional experience includes estimating damages in a variety of areas, including royalty damages related to alleged patent infringement; anticompetitive effects, and estimated damages related to alleged monopolization in the market for acute care hospital and physician services in East Texas; and lost recreational value related to proposed construction of a coastal bluff seawall. (*See* D.E. 141-3 at 6–8.) In addition, he has testified as an expert witness on damages on numerous occasions (*see* D.E. 141-3 at 3–5), and he has published in his field (*see* D.E. 141-3 at 9–10). The Court finds that Mr. Mangum is qualified to testify as a damages expert in this case.

### 2. Methodology

Like the other experts in this case, Mr. Mangum's methodology consists of reviewing the documents in the case and applying his experience to the facts as they are presented to him by those documents. This is unobjectionable. Defendants challenge Mr. Mangum's opinions as too speculative, arguing that they are based on improper factual underpinnings. (*See* D.E. 140 at 9–10.) Defendants argue that there is no evidence in the record supporting the numbers Mr. Mangum uses in his expert report. (*See id.*) As discussed below, the Court respectfully disagrees.

Mr. Mangum offers two opinions in this case, premised on the idea that Amakua had identified an "arbitrage position," or "imbalance between the amount JTL was willing to accept for Las Ventanas and the amount Warner was willing to pay for a portion of the property (the hotel only)." (D.E. 141-2 at 3.) First, Mr. Mangum opines that the value of the financial benefits

to Amakua was approximately $33,130,000, in the form of cash and property, that the portion of these benefits in cash was approximately $10,198,000, and that the portion of these financial benefits in property was approximately $22,932,000. (*See id.*) Mr. Mangum states that his estimates of property value are based on analysis and opinions rendered by Maurice Robinson, Plaintiff's other expert witness. (*See id.*) Second, Mr. Mangum offers an opinion based on a hypothetical negotiation between Amakua and the defendants, through which Amakua would release the Defendants from any and all obligations owed to Amakua with respect to Las Ventanas. Mr. Mangum concludes that Amakua would have agreed with Defendants to release its rights for approximately half of the value of the market imbalance identified above, or $16,565,000. (*See id.* at 3–4.)

Defendants challenge the factual underpinnings of Mr. Mangum's opinions, arguing that there is no support for them in the record. Mr. Mangum posits that JTL would have sold Las Ventanas to Amakua for $70,250,000, and that Warner would have bought the hotel portion of the property from Amakua for $76,000,000, leaving Amakua with $5,800,000 in cash and the remaining land and residential units on the property. (*See* D.E. 141-2 at 12.) Though it is not pellucid from Mr. Mangum's report, there appears to be adequate support for this calculation in the record, at least if the jury were to credit all the evidence in Amakua's favor. The Facilitation Agreement Amakua proposed to JTL included the price of $70,250,000 (*see* Ex. 1023), and Scofield states that JTL's David Lane agreed that was the price for which he would sell Las Ventanas (Scofield Decl. at 7). Likewise, Scofield states that John Hong agreed that Warner would purchase the hotel portion of the property for $76,000,000. (Scofield Decl. at 8.)

Furthermore, none of Defendants' record citations supports their assertion that "[b]oth Michael Scofield, Amakua's principal, and Greg Blake, Amakua's agent, stated in their

depositions that they had not reached any agreement that Warner Hotels would buy the hotel for $76 million." (D.E. 140 at 10.) The record citations do not support or require such a conclusion; for the most part, they do not address the potential for a $76 million purchase by the Warner Defendants; in one instance among these citations where that number *is* addressed, it is by Scofield, and his testimony (while a bit opaque) appears to be susceptible to the interpretation that Ty had agreed to pay that amount for the hotel. (*See* D.E. 141-21 at 8 (Ex. F, Scofield Dep. at 142:13).)

The evidence relied on by Mr. Mangum may not be the strongest evidence for calculating damages, but it is admissible evidence and its persuasiveness is properly evaluated by the jury. "Vigorous cross examination, presentation of contrary evidence and careful jury instructions, the [*Daubert*] Court said, are the traditional and appropriate means of attacking shaky but admissible evidence." *Richman*, 415 F. Supp. 2d at 933 (citing *Daubert*, 509 U.S. at 596). It appears that Defendants are really challenging Mr. Mangum's conclusions, as opposed to his methods, which is not an appropriate basis to exclude an expert witness. Assessment of an expert's conclusions is for the finder of fact, not the Court in advance of trial. Defendants' motion to strike Mr. Mangum's opinions on this basis is therefore denied.

Defendants also challenge Mr. Mangum's methods because he relied on Mr. Robinson's property analysis in calculating his damages estimates with respect to the property values. Defendants argue that Mr. Mangum should not be allowed to be a mouthpiece for another expert. But that is not what Mr. Mangum is doing—and to the extent it is, such testimony will be excluded as cumulative at trial. As things appear from the briefs, Mr. Mangum is taking another expert's opinion on the value of the property in question and incorporating that value into his overall damages calculation. He is not stating that he has appraised the property at the same

value given by Mr. Robinson; he is clearly stating that he is not an appraiser, and so he has relied on another expert's appraisal in reaching his conclusions. The trier of fact may credit his conclusions or not, but that decision is for the trier of fact, not the Court. The trier of fact also may assess whether Mr. Robinson's underlying valuation is credible when Mr. Robinson testifies. There is no need to preclude Mr. Mangum's testimony so as to prevent Plaintiff from protecting discrete expert testimony, outside Mr. Mangum's area of competence, from adversarial testing through cross-examination.

Finally, Defendants challenge the reliability of Mr. Mangum's hypothetical negotiation opinion. (D.E. 140 at 12.) Defendants' challenge to the hypothetical is, in part, derivative of its challenge to Mr. Mangum's damages calculation: Defendants argue that the hypothetical is faulty because it is based on that damages calculation. In particular, Mr. Mangum opines that if the parties had negotiated a settlement, they would have settled for half of what the transaction was worth to Amakua, or $16,565,000 (half of the damages calculation of $33,130,000). Inasmuch as the Court has deemed the damages calculation admissible, this challenge to the hypothetical negotiation opinion fails.

Defendants also challenge Mr. Mangum's hypothetical on the basis that Mr. Mangum's conclusion that the parties would have evenly split the "surplus" identified by Amakua is "entirely based on Mr. Mangum's unsubstantiated and unreasoned speculation." (D.E. 140 at 13.) Again, the Court respectfully disagrees. Mr. Mangum explains in his report that this conclusion is based on bargaining theory consistent with a "Nash Equilibrium" outcome among parties with equal negotiating power, so called for Nobel-prize-winning economist John Nash. (See D.E. 141-2 at 15 n.58 (citing John F. Nash, "The Bargaining Problem," Econometrica (April 1950)).) Defendants have not challenged the reliability of Nash's theories, and the assessment of

whether the theory persuasively can be applied in the context of this case is for the jury. Again, the Court finds that the proper method of challenging this testimony is on cross-examination. Defendants' motion to strike Mr. Mangum's testimony on this basis is denied.

### 3. Relevance

Finally, Defendants challenge Mr. Mangum's opinion that Amakua identified a financial "arbitrage" opportunity as irrelevant. (*See* D.E. 140 at 8–9.) The Court disagrees. Mr. Mangum's opinion regarding the "market imbalance" or "arbitrage" position Amakua identified may assist the trier of fact in assessing Amakua's role in the proposed transaction. Determining whether Amakua was acting as a broker or as a principal is a critical issue in this case. Thus expert opinions that would assist the jury in assessing Amakua's role are relevant. The Court will not exclude Mr. Mangum's "arbitrage" opinion on this basis.

## II. Cross-Motions for Summary Judgment

Plaintiff seeks summary judgment with respect to the breach of contract claim against the Warner Defendants (Count I) and the interference with contract claim against JTL (Count V), and requests that only damages be resolved by jury trial. (*See* D.E. 100 at 2.) Plaintiff argues that the Noncircumvention Agreement is enforceable, that the Warner Defendants breached that agreement by dealing directly with JTL (and that JTL interfered with the agreement), and that the breach caused Plaintiff $30 million in damages. (*Id.* at 10, 12–13; D.E. 64 at 9.) Defendants' cross-motion for summary judgment seeks judgment on Counts I, III, IV, and V, arguing that the Noncircumvention Agreement between Plaintiff and the Warner Defendants is unenforceable because it is a contract for illegal brokerage activity; it is an illegal restraint on competition; there was no meeting of the minds regarding the meaning of the noncircumvention provision; and Amakua's damages are too speculative to be proven. (*See* D.E. 111 at 11.)

## A.  Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004) (citation omitted). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

Courts in this district have recognized that where, as here, parties have filed cross-motions for summary judgment, the analysis requires consideration of any legitimate factual disputes or gaps in the record in the light most favorable to each of the two competing parties. *See, e.g., Northern Contracting, Inc. v. State of Illinois*, No. 00 C 4515, 2004 WL 422704, at *46 (N.D. Ill. Mar. 3, 2004) (Pallmeyer, J.) ("In cases such as this involving cross-motions for summary judgment, 'the court must extend to each party the benefit of any

factual doubt when considering the other's motion—a Janus-like perspective that sometimes forces the denial of both motions.'") (quoting *Buttitta v. City of Chicago*, 803 F. Supp. 213, 217 (N.D. Ill. 1992)). The Seventh Circuit instructs that "[w]e are particularly leery of resolving issues involving a state of mind on summary judgment." *Ashman v. Barrows*, 438 F.3d 781, 784 (7th Cir. 2006) (citing *Alexander v. Wisconsin Dept. of Health & Family Servs.*, 263 F.3d 673 (7th Cir. 2001)). In fact, "[s]ummary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles." *Ashman*, 438 F.3d at 784 (internal quotation marks and citations omitted).

## B. Summary Judgment Is Inappropriate in This Case

In this case, summary judgment is inappropriate. The parties disagree about most of the relevant issues, and their disagreements encompass numerous material factual issues. The Court will not extend the length of this opinion even further by setting forth all of the factual disputes, but the Court notes, by way of example, that the parties disagree about what information Amakua provided to the Warner Defendants after John Hong signed the Noncircumvention Agreement, and whether that information complied with the terms of the Agreement. (*See, e.g.*, D.E. 113 ¶¶ 34, 35, 36.) They disagree factually about what role Amakua was to perform in the transaction between JTL and the Warner Defendants, and, in particular, whether Amakua was acting—or would act, assuming the transaction proceeded—as a real estate broker or as a principal. These disputes relatedly implicate a factual dispute about whether the Noncircumvention Agreement is unenforceable inasmuch as it contemplates an illegal contract for brokerage services. The parties disagree about whether, in general, principals use noncircumvention agreements; whether Amakua had the financial wherewithal to engage in the contemplated transaction; and whether it was even necessary for Amakua to contribute its own capital in order to participate in the

transaction. They have factual disputes about whether the transaction, as contemplated when Amakua was involved, was to consummate in a "flip" of the hotel property, about the prevalence of flipping property in the resort hotel industry, and even about what it means to "flip" property. Moreover, the record is replete with incidents that are open to interpretation and inference, *see Ashman*, 438 F.3d at 784, and the parties disagree about their intentions, beliefs, and knowledge regarding the transaction and Amakua's role in it, and about whether Amakua misled the Defendants about its proposed role.

In sum, there are numerous disputed issues of material fact, as well as matters from which competing inferences could legitimately be drawn in different directions by a reasonable factfinder. As a result, the parties' cross-motions for summary judgment are respectfully denied.

## CONCLUSION

For the reasons given above, the parties' cross-motions for summary judgment are denied, and their respective motions to strike expert testimony are granted in part and denied in part. (D.E. 99, 110, 129, 135, 138.)

So ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Date: July 10, 2007